**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THOMAS GEBKA, Individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:19-cv-06662 |
| v. | ) ) | Hon. Sharon J. Coleman |
| ALLSTATE INSURANCE COMPANY, a Delaware limited liability company, | ) ) ) | Mag. Jeffrey I. Cummings |
| Defendant. | ) ) | **JURY TRIAL DEMANDED** |

<u>**SECOND AMENDED CLASS ACTION COMPLAINT**</u>

<u>**INTRODUCTION**</u>

1.      Plaintiff Thomas Gebka ("Plaintiff") brings this action to enforce the consumer-privacy provisions of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, a federal statute enacted in 1991 in response to widespread public outrage about the proliferation of intrusive, nuisance telemarketing practices.  *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012).

2.      In violation of the TCPA, Allstate and/or third-parties acting on its behalf made telemarketing calls to Mr. Gebka's cellular telephone number for the purposes of advertising Allstate's goods and services without express consent which is prohibited by the TCPA.

3.      Mr. Gebka never consented to receive the calls. Because telemarketing campaigns generally place calls to hundreds of thousands or even millions of potential customers en masse, the Plaintiff brings this action on behalf of proposed nationwide classes of other persons who received illegal telemarketing calls from or on behalf of the Defendant.

4.      A class action is the best means of obtaining redress for the Defendant's wide-scale

illegal telemarketing, and is consistent both with the private right of action afforded by the TCPA and the fairness and efficiency goals of Rule 23 of the Federal Rules of Civil Procedure.

5.      This is an action for injunctive relief, statutory damages, and actual damages based on these unlawful telemarketing calls (commonly referred to as "robocalls") in violation of the federal TCPA.

## THE PARTIES

6.      Thomas Gebka is an individual residing in Hendersonville, Tennessee.

7.      Allstate Insurance Company ("Allstate" or "Defendant"), a wholly-owned subsidiary of Allstate Insurance Holdings, LLC, is a Delaware limited liability company with its corporate Headquarters located in Northbrook Illinois, which is located within this district.

## JURISDICTION AND VENUE

8.      The Court has federal question subject matter jurisdiction over these TCPA claims. *Mims v. Arrow Financial Services, LLC*, 565 U.S. 368 (2012).

9.      The events described herein relate to unlawful telemarketing calls to Plaintiff's cellular telephone number.

10.     Venue is appropriate in this district pursuant to 47 U.S.C. § 227(b)(3) as Defendant is headquartered and does business within this District.

## THE TELEPHONE CONSUMER PROTECTION ACT

11.     In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy [.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

12.     According to findings by the Federal Communication Commission ("FCC"), the

agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, artificial and prerecorded voice telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.

The TCPA Prohibits Artificial and Prerecorded Voice Telemarketing Calls

13.     The TCPA makes it unlawful to make any telemarketing call, using an artificial or prerecorded voice, to any cellular telephone line without express written consent.  *See* 47 U.S.C. § 227(b)(1)(A)(iii).  The TCPA provides a private cause of action to persons who receive calls in violation of 47 U.S.C. § 227(b)(1)(A).  *See* 47 U.S.C. § 227(b)(3).

The TCPA Prohibits Calling Numbers on the National Do Not Call Registry

14.     The TCPA also prohibits making advertising or telemarking calls to any telephone number that has been registered on the National Do-Not-Call registry.  *See* 47 C.F.R. § 64.1200(c)(2); 47 U.S.C. § 227(c)(5).

15.     The TCPA provides a private cause of action to persons who receive more than one call on behalf of the same entity within any 12-month period in violation of 47 C.F.R. § 64.1200(c)(2).  *See* 47 U.S.C. § 227(c)(5).

Sellers like Allstate Can be Liable under the TCPA for the Calls

16.     The FCC has held that a company on whose behalf a telephone call is made bears the responsibility for any violations.  *In re Rules Implementing the Tel. Consumer Prot. Act of 1991*, 23 FCC Rcd 559, 565 (¶ 10) (Jan. 4, 2008) (specifically recognizing "on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

113906_5

17.     On May 9, 2013, the FCC released a Declaratory Ruling holding that a corporation or other entity that contracts-out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In re DISH Network, LLC*, 28 FCC Rcd 6574, 6574 (¶ 1) (2013).

18.     The May 2013 FCC Ruling held that, even absent evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. *In re DISH Network, LLC*, 28 FCC Rcd at 6586 (¶ 34).

19.     The FCC has rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *In re DISH Network, LLC*, 28 FCC Rcd at 6587 n.107.

20.     The May 2013 FCC Ruling further clarifies the circumstances under which a telemarketer has apparent authority:

> [A]pparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

*In re DISH Network, LLC*, 28 FCC Rcd at 6592 (¶ 46).

21.     The Federal Communication Commission has confirmed sellers such as Allstate may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*In re DISH Network, LLC*, 28 FCC Rcd at 6588 (¶ 37) (internal citations omitted).

## THE UNLAWFUL CONDUCT

22.     Plaintiff restates the above and foregoing as though fully restated herein.

23.     Allstate authorizes its agencies (hereinafter, "Allstate agencies") to act as agents of Allstate for the purpose of soliciting, selling, and servicing Allstate insurance, and the Allstate agencies consent to so act.

24.     Allstate agencies have Allstate's actual and apparent authority to appoint subagents for solicitation and telemarketing purposes.

25.     Allstate agencies contractually agree to indemnify and be responsible to Allstate for any third-party subagents.

26.     Pursuant to direction and encouragement from Allstate, Allstate agencies appoint third-party telemarketing vendors as subagents to solicit people to purchase Allstate insurance.

27.     Specifically, Allstate agencies engage third-party telemarketing vendors to make telemarketing calls to generate "leads" to purchase Allstate insurance.

28.     The third-party vendors directed call centers to make telemarketing calls to generate

the "leads" to purchase Allstate insurance.

29.     The lead-generation process involves making telemarketing calls, without prior express written consent, invitation or permission, to telephone numbers obtained from sources other than Allstate or Allstate agencies, for the purpose of advertising and encouraging the purchase of Allstate insurance.

30.     The illegal telemarketing calls are either live-transferred to an Allstate agency without ever ending the call (sometimes known as a "live transfer lead"), or the called party's contact information is provided to an Allstate agency for a callback (sometimes known as an "Internet" or "call verified lead").

31.     In both cases, the Allstate agencies accepted the live-transfer calls and the call-verified/Internet lead information, spoke to those consumers about purchasing Allstate insurance, and provided some of them quotes for Allstate insurance.

32.     Allstate and the Allstate agencies knowingly accepted business originated through the illegal telemarketing calls.

**The Calls to Plaintiff**

33.     Plaintiff's residential telephone number was registered on the National Do Not Call Registry for more than 31 days prior to the calls at issue.

34.     On August 8, 2019 Plaintiff received a telephone call on his cellular telephone number on behalf of Allstate from caller ID 708-555-0000.

35.     No company name was transmitted via Caller ID.

36.     At the outset of the call, there was a brief pause of dead air, then a live representative came on the line, said he was calling on behalf of Allstate, and asked Plaintiff if he was interested in an insurance quote from Allstate. Plaintiff terminated the call.

113906_5

37.    A few hours later, on August 8, 2019, Plaintiff received another telephone call on his cellular telephone number on behalf of Allstate, this time from caller ID 312-555-0000.

38.    No caller ID name was transmitted.

39.    At the outset of the call, there was a brief pause of dead air, then a live representative came on the line and said he was calling on behalf of Allstate. The caller promoted Allstate insurance products and services, and Plaintiff was asked if he would look at an Allstate insurance quote.

40.    After confirming Plaintiff's vehicle and personal information, the telemarketer transferred the call (with Plaintiff still on the line) to an Allstate agency located in Alsip, Illinois, and an Allstate agent from the agency spoke to Plaintiff about a quote for Allstate insurance.

41.    The same day, the Allstate agency sent Plaintiff an email containing Allstate's corporate name and address, a hyperlink to a quote for Allstate insurance, and a hyperlink to Allstate's website.

42.    Later on August 8, 2019, Plaintiff received yet another telephone call on his cellular telephone number on behalf of Allstate, this time from caller ID 331-216-1926, again asking if he was interested in an Allstate insurance quote. Plaintiff terminated the call.

43.    On September 18, 2019 Plaintiff received another telephone call on his cellular telephone number on behalf of Allstate, this time from caller ID number 630-718-1821.

44.    At the outset of the call, there was a brief pause of dead air, then a live representative came on the line and said he was calling on behalf of Allstate. Plaintiff was not interested in the products or services being offered, but he listened to the entire telemarketing pitch on September 18, 2019 to confirm Allstate was behind the call. The caller promoted Allstate insurance products and services, and asked Plaintiff if he was interested in a quote for Allstate

7

insurance.

45.     Plaintiff told the Allstate representative to never call Plaintiff again.

46.     The August 8, 2020 and September 18, 2020 calls to Plaintiff's cellular telephone number were placed by call centers directed by Richardson Marketing Group, a third-party telemarketing vendor numerous Allstate agencies used to generate leads based on Allstate's endorsement of Richardson Marketing Group.

47.     Allstate endorsed Richardson Marketing Group to Allstate agencies.

48.     Plaintiff's cellular telephone number was not added to Defendant's or its callers' internal do-not-call lists, they did not create or maintain any record of Plaintiff's request not to receive further telemarketing calls, and they did not honor Plaintiff's do-not-call request.

49.     Instead, Plaintiff continued to receive telemarketing calls promoting Allstate's insurance products.

50.     In fact, the telemarketing calls to Plaintiff's cellphone about Allstate insurance did not stop even after Plaintiff filed this lawsuit.

51.     On July 21, 2020, Plaintiff received yet another call on his cellular telephone number on behalf of Allstate, this time from caller ID 630-994-9685 using an artificial and/or prerecorded voice.

52.     A voice asked if Plaintiff was interested in an auto insurance quote.

53.     Then the system paused and waited for a prompt from Plaintiff.

54.     In order to determine who made the artificial and/or prerecorded voice call, Plaintiff said yes to the prerecorded/artificial voice prompt.

55.     After Plaintiff said yes to the prerecorded/artificial voice prompt, the system paused while it analyzed Plaintiff's response.  Then the system asked for Plaintiff's name, zip code, and

the make and model of his automobile.

56.     Then the system paused and waited for a prompt from Plaintiff.

57.     After Plaintiff recited the requested information, the system paused while it analyzed Plaintiff's response. Then the system asked if Plaintiff was interested in receiving quotes for other types of insurance.

58.     Less than one hour after Plaintiff terminated the telemarketing call on July 21, 2020, an Allstate agency in Olive Branch, Mississippi called Plaintiff's cellular telephone number. Plaintiff did not answer the call, and an Allstate agent left a voicemail about insurance from Allstate.

59.     The same Allstate agency in Olive Branch, Mississippi called Plaintiff's cellular telephone number again on July 23, 2020, August 4, 2020, and August 20, 2020.

60.     Plaintiff did not answer the first two calls, and both times the same Allstate agent from the July 21st call left a voicemail about Allstate insurance.

61.     Plaintiff answered the August 20, 2020 call and asked the Allstate agent how he obtained Plaintiff's phone number. The Allstate agent said he received it from a lead source called Everquote.

62.     The Allstate agent said he was calling to make sure Plaintiff found a good insurance quote.

63.      At the end of the August 20th call with the Allstate agent, Plaintiff requested that he be placed on a do not call list. The Allstate agent responded that Plaintiff's number was already on the National Do Not Call Registry.

64.     Later on August 20, 2020, the Allstate agency sent Plaintiff an email containing Allstate's corporate name and address, a hyperlink to a quote for Allstate insurance, and a

hyperlink to Allstate's website.

65.     On February 25, 2021, Plaintiff received yet another call on his cellular telephone number using an artificial and/or prerecorded voice, this time from caller ID (630) 890-4056.

66.     The same voice from the July 21st telemarketing call asked if Plaintiff was interested in an auto insurance quote.

67.     Then the system paused and waited for a prompt from Plaintiff.

68.     In order to determine who made this artificial/prerecorded voice call, Plaintiff said yes to the artificial/prerecorded voice prompt.

69.     After Plaintiff said yes to the artificial/prerecorded voice prompt, the system paused while it analyzed Plaintiff's response.  Then the system asked for Plaintiff's name, zip code, and the make and model of his automobile.

70.     Then the system paused and waited for a prompt from Plaintiff.

71.     After Plaintiff recited the requested information, the system paused while it analyzed Plaintiff's response.  Then the system asked if Plaintiff was interested in receiving quotes for other types of insurance.

72.     The July 21, 2020 and February 25, 2021 calls both asked the same questions, phrased in the same way, in the same sequence, using the same voice, with identical intonation. This indicates both calls used an artificial and/or prerecorded voice.

73.     During the July 21, 2020 and February 25, 2021 calls, the voice, after asking each question, paused and, without making any other comments or sounds, waited for Plaintiff to speak, and there was complete silence during each pause without the sea of voices or other background noise of a call center.  This indicates both calls used an artificial and/or prerecorded voice.

74.     During the July 21, 2020 and February 25, 2021 calls, after each time Plaintiff

10

spoke, the system paused while the program analyzed what Plaintiff had said and determined what to say or ask Plaintiff next. This indicates both calls used an artificial and/or prerecorded voice.

75. The template-based, generic content of the messages that played during the July 21, 2020 and February 25, 2021 calls also indicates both calls used an artificial and/or prerecorded voice.

76. At no time did Plaintiff provide express written consent authorizing Allstate, any Allstate agency, or anyone else to deliver or cause to be delivered advertisements or telemarketing messages to his cellular telephone number using an artificial or prerecorded voice.

77. At no time did Plaintiff sign a written agreement with Allstate, any Allstate agency, or anyone else containing Plaintiff's cellular telephone number and stating Plaintiff agrees to be contacted on that number by Allstate or any Allstate agency.

## ALLSTATE'S LIABILITY

78. Allstate is extensively involved in the operations of Allstate agencies.

79. Allstate requires Allstate agencies to follow detailed standards.

80. Allstate sets the standards Allstate agencies must follow.

81. Allstate has the ability, at any time without prior notice to Allstate agencies, to change the standards Allstate agencies must follow.

82. From time to time, Allstate changes the standards Allstate agencies must follow.

83. Allstate has the right to monitor the Allstate agencies' compliance with Allstate's standards and terminate the agency relationship for noncompliance.

84. Allstate sets new customer growth targets for Allstate agencies.

85. Allstate monitored and periodically assessed the Allstate agencies' performance.

86. Allstate authorized, advised, and encouraged Allstate agencies to use third-party

113906_5

vendors to generate "leads" to purchase Allstate insurance policies, including by making telemarketing calls.

87.     It was common for Allstate to discuss third-party lead vendors during meetings with Allstate agencies.

88.     Allstate recommended to Allstate agencies that they engage third-party vendors to make telemarketing calls to generate leads.

89.     Allstate helped Allstate agencies identify and engage third-party lead vendors.

90.     The Allstate Lead Marketplace is an online platform through which Allstate agencies purchase lead-generation services from third-party telemarketing vendors.

91.     Allstate promoted the Allstate Lead Marketplace program to Allstate agencies.

92.     Everquote is, or at all times relevant was, a third-party telemarketing vendor who participates in the Allstate Lead Marketplace program.

93.     Allstate set up meetings between Allstate agencies and third-party telemarketing vendors for the vendors to pitch their services.  Allstate invited Allstate agencies to attend those meetings, and Allstate participated in those meetings.

94.     During those meetings, third-party telemarketing vendors spoke about their lead-generation services and explained their telemarketing process, including that it would involve making calls to solicit people to purchase Allstate insurance.

95.     Richardson Marketing Group is a third-party lead vendor who participated in such a meeting with Allstate and Allstate agencies.

96.     Allstate endorsed Richardson Marketing Group to Allstate agencies.

97.     Allstate was involved in obtaining special group pricing from Richardson Marketing Group for Allstate agencies who used Richardson Marketing Group's lead-generation

12

and telemarketing services.

98. During the relevant period, Allstate agencies entered into over eighty (80) separate agreements with Richardson Marketing Group for lead-generation services.

99. Plaintiff's lawsuit is not the first lawsuit seeking redress for telemarketing calls about Allstate insurance that were placed pursuant to lead-generation agreements with Richardson Marketing Group.

100. Before this lawsuit was filed, another individual whose cellular telephone number is on the National Do Not Call Registry filed a lawsuit complaining of telemarketing calls promoting Allstate insurance that were placed pursuant to a lead-generation agreement between Richardson Marketing Group and an Allstate agency.

101. Allstate knew about the prior lawsuit, and that it involved telemarketing calls placed on behalf of Allstate pursuant to a lead-generation agreement between Richardson Marketing Group and an Allstate agency.

102. Allstate did not discipline the Allstate agency that was involved, and did not request or recommend that the Allstate agency end its relationship with Richardson Marketing Group.

103. Allstate knew Plaintiff's subsequent lawsuit involved telemarketing calls placed on behalf of Allstate pursuant to a lead-generation agreement between Richardson Marketing Group and an Allstate agency.

104. Allstate did not discipline the Allstate agency that was involved, and did not request or recommend that the Allstate agency end its relationship with Richardson Marketing Group.

105. Allstate helps finance Allstate agencies' use of third-party telemarketing vendors.

106. Allstate knew Allstate agencies were using third-party vendors to make telemarketing calls to generate leads to purchase Allstate insurance.

107. Allstate and the Allstate agencies knew the lead-generation process involved third-party vendors making (or causing others to make) telephone calls to solicit people to purchase Allstate insurance.

108. Allstate and the Allstate agencies knew those telemarketing calls were being made to telephone numbers on the National Do Not Call Registry.

109. Upon information and belief, hundreds of Allstate agencies used third-party lead vendors endorsed by Allstate to make telemarketing calls to generate leads to purchase Allstate insurance.

110. The Allstate agencies maintained interim control over the third-party telemarketing vendors' and the call centers' actions.

111. The Allstate agencies specified to the third-party telemarketing vendors the geographic parameters for the leads they could telemarket to, the specific type(s) of Allstate insurance to promote, the number of leads to generate, and the times in which to call.

112. The Allstate agencies instructed the vendors whether to provide the lead's contact information to the agency for a callback, or transfer the calls "live" to the agency and to what specific telephone number(s).

113. The Allstate agencies had the right to terminate their relationships with the third-party telemarketing vendors.

114. The Allstate agencies had the ability to make interim changes to the call specifications.

115. The Allstate agencies changed various call specifications from time to time.

116. The third-party telemarketing vendors passed the Allstate agencies' call specifications down the chain to the call centers they directed to place the calls, and the call

14

centers complied.

117.    The Allstate agencies maintained ultimate discretion about whether to accept any given lead from the third-party vendors and provide a lead a quote for Allstate insurance.

118.    Allstate insurance policies were sold to leads generated by the illegal telemarketing calls, thereby enlarging Allstate's customer base, and insurance premiums were collected for those insurance policies.

119.    When an Allstate agency sells an Allstate insurance policy and a premium is collected on that policy, Allstate receives a portion of the premium and the Allstate agency receives a portion of the premium.

## CLASS ALLEGATIONS

120.    As authorized by Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of a class of all other persons or entities similarly situated throughout the United States.

121.    The classes of persons Plaintiff proposes to represent are tentatively defined, subject to amendment, as follows:

> **Artificial/Prerecorded Voice Class**
> Each person within the United States: (1) to whose cellular telephone number; (2) Defendant or anyone acting on Defendant's behalf placed a non-emergency telephone call; (3) promoting Defendant's products or services; (4) using an artificial or prerecorded voice; (5) without prior express written consent of the called party to call said telephone number; (6) at any time from October 8, 2015 through trial
>
> **Do Not Call Class**
> Each person in the United States: (1) to whose telephone number Defendant or anyone acting on Defendant's behalf initiated two or more telephone solicitations during a 12-month period; (2) where the person's telephone number was registered on the National Do Not Call Registry more than thirty-one days before the telephone solicitations; (3) at any time from October 8, 2015 through trial.

113906_5

122.    Upon information and belief, the members of the classes received one or more automated calls for telemarketing purposes without having given prior express consent.

123.    The classes as defined above are identifiable through phone records, phone number databases, and business records.

124.    The potential class members number at least in the thousands, since automated telemarketing campaigns make calls to hundreds or thousands of individuals per day. Individual joinder of these persons is impracticable.

125.    Plaintiff is a member of the proposed classes.

126.    There are questions of law and fact common to Plaintiff and to the  proposed classes, including but not limited to the following:

a)      Whether Defendant violated the TCPA;

b)      Whether the calls used an artificial and/or prerecorded voice;

c)      Whether the calls constitute telephone solicitations;

d)      Whether the calls constitute telemarketing;

e)      Whether the calls included or introduced an advertisement;

f)      Whether the conduct of Defendant, the Allstate agencies, the third-party vendors, and/or any subcontractors who placed the calls was knowing and/or willful;

g)      Whether Allstate agencies are agents of Allstate;

h)      Whether Allstate ratified the conduct of the Allstate agencies;

i)      Whether the third-party vendors are agents of the Allstate agencies and/or Allstate;

j)      Whether the Allstate agencies and/or Allstate ratified the conduct of the

16

third-party vendors;

k) Whether the third-party vendors are subagents of Allstate and/or the Allstate agencies;

l) Whether Defendant is liable for the calls; and

m) Whether the Plaintiff and the class members are entitled to statutory damages and/or injunctive relief because of Defendant's actions.

127. Plaintiff's claims are typical of the claims of class members. Plaintiff's claims, like the claims of the Class arise out of the same common course of conduct by Defendant and its agents and subagents, and are based on the same legal and remedial theories.

128. Plaintiff is an adequate representative of the classes because his interests do not conflict with the interests of the classes, he will fairly and adequately protect the interests of the classes, and he is represented by counsel skilled and experienced in class actions.

129. Common questions of law and fact predominate over questions affecting only individual class members. The only individual question concerns identification of class members, which will be ascertainable from records maintained by Defendant, its agents and subagents, the National Do Not Call Registry, and others.

130. Management of these claims is likely to present significantly fewer difficulties than are presented in many class claims because the calls at issue are all automated. Class treatment is superior to multiple individual suits or piecemeal litigation because it conserves judicial resources, promotes consistency and efficiency of adjudication, provides a forum for small claimants, and deters illegal activities. There will be no significant difficulty in the management of this case as a class action.

131. The likelihood that individual members of the classes will prosecute separate

17

actions is remote due to the time and expense necessary to prosecute an individual case.

132.    Plaintiff is not aware of any litigation concerning this controversy already commenced by others who meet the criteria for class membership described above.

133.    Defendant has acted and failed to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby making final injunctive relief and corresponding declaratory relief appropriate with respect to the Class as a whole. Prosecution of separate actions by individual members of the putative Class, should they even realize that their rights have been violated, would likely create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct.

134.    The identities of the class are readily identifiable from records maintained by Defendant, its agents and subagents, the National Do Not Call Registry, and others.

**COUNT I**
**Violations of the TCPA**
**Artificial/Prerecorded Voice Calls to Cellular Numbers**

135.    Plaintiff and the class members re-allege and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

136.    Defendant or someone acting on Defendant's behalf made at least one call to Plaintiff's cellular telephone numbers using an artificial or prerecorded voice.

137.    The calls to Plaintiff's cellular telephone number were not made for emergency purposes within the meaning of the TCPA.

138.    The calls to Plaintiff's cellular telephone number advertised the commercial availability or quality of Defendant's insurance goods and/or services.

139.    The calls to Plaintiff's cellular telephone number "included or introduced an advertisement" within the meaning of the TCPA.

18

140. The calls to Plaintiff's cellular telephone number were for the purpose of encouraging the purchase or rental of, or investment in, Defendant's insurance goods and/or services.

141. The calls to Plaintiff's cellular telephone number constitute "telemarketing" within the meaning of the TCPA.

142. Neither Defendant nor any entity calling on behalf of Defendant had Plaintiff's prior express written consent to make the calls to Plaintiff's cellular telephone number using an artificial or prerecorded voice.

143. Neither Defendant nor any entity calling on behalf of Defendant had Plaintiff's "prior express written consent," as defined by 47 C.F.R. § 64.1200(f)(8), to make the calls to Plaintiff's cellular telephone number.

144. Plaintiff's telephone number is, and at all times pertinent was, assigned to a cellular telephone service within the meaning of 47 U.S.C. § 227(b)(1)(A)(iii) and 47 C.F.R. § 64.1200(a)(1)-(2).

145. Defendant violated the TCPA, including 47 U.S.C. § 227(b)(1)(A)(iii), each time Defendant or someone acting on Defendant's behalf made a non-emergency call to Plaintiff's cellular telephone number using an artificial or prerecorded without Plaintiff's prior express consent.

146. Defendant violated the TCPA implementing regulations, including 47 C.F.R. § 64.1200(a)(2), each time Defendant or someone acting on Defendant's behalf made a call to Plaintiff's cellular telephone number that included or introduced an advertisement, or constituted telemarketing, using an artificial or prerecorded voice without Plaintiff's prior express written consent.

19

147.     Defendant's artificial or prerecorded voice calls invaded Plaintiff's and the class members' privacy and violated their legal rights under federal law to not be subjected to such unlawful and anonymous automated calls.

148.     The artificial or prerecorded voice calls to Plaintiff's and the class members' cellular telephone numbers, and the acts and omissions as to those calls described herein, were deliberate and conscious acts or omissions.

149.     The artificial or prerecorded voice calls to Plaintiff's and the class members' cellular telephone numbers were willful or knowing as those terms are defined in the Communications Act of 1934 and administered by the FCC. Therefore it is within the Court's discretion to award Plaintiff and the class members up to three times the available statutory damages as prescribed under 47 USC § 227(b)(3) and 47 USC § 227(c)(5).

150.     As a result of Defendant's illegal conduct, Plaintiff and the members of the class suffered actual damages and, under 47 U.S.C. § 227(b)(3) and 47 U.S.C. § 227(c)(5), are entitled to, *inter alia*, a minimum of $500.00 in damages for each such violation of the TCPA.

151.     Plaintiff and the class members are also entitled to and do seek injunctive relief prohibiting Defendant from violating the TCPA in the future.

**COUNT II**
**Violations of the TCPA**
**Advertising/Telemarketing Calls to**
**Numbers on the National Do Not Call Registry**

152.     Plaintiff and the class members re-allege and incorporate by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

153.     It is a violation of the TCPA for any person or entity to initiate any telephone solicitation to a residential or cellular number registered on the National Do Not Call Registry. *See* 47 C.F.R. § 64.1200(c)(2); *id.* at § 64.1200(e).

154. Defendant or someone acting on Defendant's behalf made two or more telephone solicitation calls to Plaintiff's and the putative class members' telephone numbers that were registered on the National Do Not Call Registry for more than 31 days prior to the calls.

155. The FCC's TCPA regulations make it unlawful to "initiate" telemarketing calls to any residential or cellular number without maintaining a list of persons who request not to receive calls, recording each do-not-call request and adding the person's name and phone number to the internal do-not-call list, and honoring each do-not-call request for 5 years from when it is made. *See* 47 C.F.R. § 64.1200(d)(3), (6); *id.* at § 64.1200(e).

156. The TCPA regulations provide a do-not-call request "shall apply to the particular business entity . . . on whose behalf a call is made[.]" 47 C.F.R. § 64.1200(d)(5).

157. Interpreting the meaning of the word "initiate" in its TCPA regulations, the FCC has clarified that a "person or entity 'initiates' a telephone call when it takes the steps necessary to physically place a telephone call." *In re Dish Network, LLC*, 28 FCC Rcd at 6582-83. The FCC's interpretation of its regulations implementing the TCPA merits substantial deference. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (reviewing courts "must give substantial deference to an agency's interpretation of its own regulations"); *see CE Design, Ltd. v. Prism Business Media, Inc.*, 606 F.3d 443, 450 (7th Cir. 2010).

158. Plaintiff and members of the putative Class have received more than one telephone call on behalf of Defendant within a twelve (12) month period in violation of the regulations set forth in 47 C.F.R. § 64.1200.

159. As a result of Defendant's conduct and pursuant to 47 U.S.C. § 227(c)(5) of the TCPA, Plaintiff and the other members of the putative Class were harmed and are each entitled to $500.00 in damages for each violation. Plaintiff and the class are also entitled to an injunction

against future calls.

**WHEREFORE**, Plaintiff Thomas Gebka, on behalf of himself and the other members of the Classes, prays for the following relief:

a) A declaration that Defendant's practices described herein violate the Telephone Consumer Protection Act, 47 U.S.C. § 227;

b) An injunction prohibiting Defendants from initiating telephone solicitations to persons who have registered their telephone numbers with the National Do Not Call Registry;

c) An award of actual damages;

d) An award of statutory damages for Plaintiff and each Class member in the amount of $500.00 for each and every call that violated the TCPA;

e) An award of treble damages, as provided by statute, of up to $1,500.00 for Plaintiff and each Class member for each and every call that violated the TCPA;

f) An order certifying this action to be a proper class action pursuant to the Federal Rules of Civil Procedure 23, establishing the appropriate Class and any Subclasses the Court deems appropriate, finding that Plaintiff is a proper representative of the Class, and appointing the lawyers and law firms representing Plaintiff as counsel for the Class; and

g) Such further and other relief the Court deems reasonable and just.

## **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff, individually and on behalf of all others similarly situated, demands a trial by jury on all issues so triable.

Dated: May 20, 2021

Respectfully Submitted,

THOMAS GEBKA, individually and on behalf of all others similarly situated, Plaintiffs

By: /s/ Keith J. Keogh

Keith J. Keogh
Theodore H. Kuyper
KEOGH LAW, LTD.
55 W. Monroe Street, Suite 3390
Chicago, Illinois 60603
(312) 726-1092
(312) 726-1093 (fax)
keith@keoghlaw.com
tkuyper@keoghlaw.com

*Attorneys for Plaintiff and the Putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that, on May 20, 2021, I caused a copy of the foregoing **Second Amended Class Action Complaint** to be served upon all counsel of record via electronic filing using the CM/ECF system.

        /s/ Keith J. Keogh